UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ZENOBIA I. MORGAN,

                    Plaintiff,              Case No. 12-12021
                                         Honorable Thomas L. Ludington
                                         Magistrate Judge David R. Grand

v.

COMMISSIONER OF
SOCIAL SECURITY,

                    Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT [8, 9]**

       Plaintiff Zenobia I. Morgan ("Morgan") brings this action pursuant to 42 U.S.C. §405(g),

challenging the final decision of Defendant Commissioner of Social Security ("Commissioner")

denying her application for Disability Insurance Benefits ("DIB") under the Social Security Act

(the "Act"). Both parties have filed summary judgment motions [8, 9], which have been referred

to this court for a Report and Recommendation pursuant to 28 U.S.C. §636(b)(1)(B).

**I.      RECOMMENDATION**

       For the reasons set forth below, the court finds that substantial evidence supports the

Administrative Law Judge's ("ALJ") conclusion that Morgan is not disabled under the Act.

Accordingly, the court recommends that the Commissioner's Motion for Summary Judgment [9]

be GRANTED, Morgan's Motion for Summary Judgment [8] be DENIED, and that, pursuant to

sentence four of 42 U.S.C. §405(g), the Commissioner's decision be AFFIRMED.

**II.     REPORT**

      **A.     Procedural History**

       On June 11, 2009, Morgan filed an application for DIB, alleging a disability onset date of

January 1, 2008.[1]  (Tr. 118-21).  This application was denied initially on September 25, 2009.  (Tr. 76-80).  Morgan filed a timely request for an administrative hearing, which was held on August 31, 2010, before ALJ Ayrie Moore.  (Tr. 34-64).  Morgan, who was represented by attorney Donald Busta, testified at the hearing, as did vocational expert ("VE") Frank Mendrick.  (*Id.*).  On September 24, 2010, the ALJ found that Morgan was not disabled.  (Tr. 19-30).  On April 26, 2012, the Appeals Council denied review.  (Tr. 1-4).  Morgan filed for judicial review of the final decision on May 4, 2012 [1].

### B.    Background

#### 1.    Disability Reports

In a June 15, 2009 disability field office report, Morgan reported that her alleged onset date was January 1, 2008.  (Tr. 147).  The claims examiner noted that, during a face-to-face interview, Morgan did not have any difficulty understanding, concentrating, talking, or answering questions.  (Tr. 149).  The claims examiner also noted that Morgan was dressed and groomed properly and that she was "quiet and answered slowly."  (*Id.*).

In an undated disability report, Morgan indicated that her ability to work is limited by a "mental disability."  (Tr. 152).  When describing how this condition limits her ability to work, Morgan stated, "The attacks happen frequently.  I feel as if I cannot breath[e] cannot talk constant fear."  (*Id.*).  Morgan reported that this condition first interfered with her ability to work on March 1, 2007, and that she became unable to work on January 1, 2008.  (*Id.*).  Since that time, she worked briefly in three positions,[2] with fewer hours, changes in her job duties, and

---

[1] Morgan amended her application to reflect this date of alleged onset of disability.  (Tr. 147).

[2] Morgan worked as a laundry clerk for Midfield Hospitality from January 1, 2008 to July 1, 2008; as a program assistant for The Guidance Center (her therapists' office) from July 25, 2008 to September 5, 2008; and as a telemarketer for Cancer Support Services for one day (November 15, 2008).  (Tr. 136, 163).

assistance from her employers. (*Id.*). She indicated that she took a medical leave of absence from her job at The Guidance Center to seek counseling, but claimed that the Center would not let her return to work after her condition later worsened.[3] (*Id.*). Prior to the onset of her alleged disability, Morgan worked as a pharmacy technician, from approximately 2001 to February of 2007. (Tr. 153). Before that, she completed high school and one year of college. (Tr. 157). She indicated that she had treated with several medical providers regarding her anxiety, depression, migraines, and high blood pressure. (Tr. 155-56). At the time of the report, she was taking several medications, including Buspar (for depression), Lexapro (for anxiety), and Naproxen (for migraines). (Tr. 156). She claimed that both Buspar and Lexapro made her dizzy. (*Id.*).

In a function report dated July 4, 2009, Morgan reported that she lives in a house with her daughter. (Tr. 175). In the morning, she makes coffee and toast, takes her medication, and looks in her journal for reminders of appointments. (*Id.*). During the day, she might read the Bible, "clean up any messes," and get dressed (if she has an appointment). (*Id.*). With her daughter's help, she is able to care for her pet. (Tr. 176). When asked what she could do before the onset of her conditions that she is no longer able to do, Morgan said, "I use to work and get up get dressed with no difficulty." (*Id.*). Her conditions interfere with her ability to sleep. (*Id.*). Morgan is able to attend to her own personal care, although she needs some reminders (to shave, take her medication, etc.) and some things take her longer than they used to. (Tr. 176-77). She no longer drives (because it makes her nervous). (Tr. 178). Morgan can prepare simple meals (toast, cereal, microwaveable meals), but she no longer cooks dinner for her daughter. (Tr. 177). She is able to do laundry, clean the house, and go shopping (although she often does this in the

---

[3] As discussed below, however, medical records from The Guidance Center indicate that Morgan took this leave of absence not for medical reasons, but to obtain suitable housing for herself and her daughter. (Tr. 416).

3

early morning hours when the store is not busy). (Tr. 177-78). She goes outside when she has appointments, but she does not like to go out alone because she is afraid that she will "get sick." (Tr. 178). She is able to pay bills, count change, handle a savings account, and use a checkbook/money orders. (*Id.*). Her hobbies include watching movies and reading, and she engages in these hobbies almost every day. (Tr. 179). She watches movies with her daughter a couple of times a week, she spends time with friends, and she does not have any trouble getting along with others. (Tr. 179-80).

When asked to identify functions impacted by her condition, Morgan checked talking, memory, completing tasks, concentration, understanding, and using her hands. (Tr. 180). She can pay attention for thirty minutes, but she often is unable to finish what she starts. (*Id.*). She is able to follow spoken instructions (so long as they are given slowly and repeated), and she has no trouble following written instructions. (*Id.*). She gets along well with authority figures and has never been fired from a job because of problems getting along with others. (Tr. 181). She does not handle stress or change well, and she is constantly afraid she is having a heart attack. (*Id.*).

In a third party function report dated July 6, 2009, Morgan's daughter, Zarvae Jones, reported that Morgan spends time writing in her journal, attempting to clean up, and reading chapters in her Bible. (Tr. 187). She indicated that Morgan walks her dog (but is afraid to leave the yard). (Tr. 188). Jones indicated that Morgan no longer works or goes out with friends, and she has trouble sleeping. (*Id.*). According to Jones, Morgan occasionally needs to be reminded to bathe, groom, and take her medication. (Tr. 189). She is able to prepare simple meals, do laundry, and load the dishwasher. (*Id.*). She reported that Morgan does not drive and is afraid to leave the house alone. (Tr. 190). According to Jones, Morgan has trouble getting along with people; she rarely talks to family, old friends, or former co-workers; and she argues with Jones.

(Tr. 192). Jones indicated that Morgan has difficulty talking, seeing, completing tasks, following instructions, using her hands, getting along with others, and with memory and concentration. (*Id.*). According to Jones, Morgan cannot follow verbal or written instructions well, has trouble finishing what she starts, becomes fearful and withdrawn around authority figures, and does not handle stress well. (Tr. 192-93).

In an undated disability appeals report, Morgan reported that her condition had worsened since her last report, and she had been having "more anxiety issues" since July of 2009. (Tr. 199). Since the time of her last report, she had begun receiving treatment at The Guidance Center for anxiety, depression, and agoraphobia. (Tr. 200). She was taking Buspar (for depression), Lexapro and chlordiazepoxide (for anxiety), and Naproxen (for migraines). (Tr. 201). She claimed that these medications made her "dizzy and dazed,"[4] and that she lacked the energy to complete tasks. (Tr. 202). She reported that, since the time of her last disability report, she was more stressed, more "afraid of outcomes," and experiencing increased anxiety attacks. (*Id.*).

### 2.   *Plaintiff's Testimony*

At the August 31, 2010 hearing before the ALJ, Morgan testified that she lives in a house with her nineteen-year-old daughter. (Tr. 38). She has a driver's license and is able to drive. (Tr. 38-39). She completed high school and had additional training in medical word processing. (Tr. 39). She is able to attend to her personal care, although it takes her longer to do things than it used to. (Tr. 53-54). She is able to wash dishes, load the dishwasher, do laundry, fold clothes, and cook simple meals. (Tr. 54). She does some yard work and gardens, and she goes grocery shopping (although she goes at times when she knows the store is not busy so that she does not

---

[4] As discussed below, however, Morgan consistently reported to her psychiatrists that she was not experiencing any side effects from her medications. (*See, e.g.,* Tr. 244, 387, 389).

have a panic attack).  (Tr. 54-55).  She uses a computer for e-mail and other purposes, she reads, and she walks around her yard.  (Tr. 55-56).  She also testified that she and her daughter rent movies or go to the movies together sometimes.  (Tr. 57).  She does not play board games, belong to social or civic groups, attend church, or volunteer.  (Tr. 56-57).

Morgan testified that her depression and anxiety prevent her from working because they affect her ability to sleep, to wake up, and to have consistent attendance.  (Tr. 43).  She testified that she has anxiety attacks at least three times per day.  (Tr. 51).  She has good days and bad days, although she says that she has four or five bad days per week.  (Tr. 43, 49).  She also testified that while at work, she often had difficulty concentrating (because of the anxiety attacks) and was easily distracted.[5]  (Tr. 50-51).  She does not have as many friends as she did in the past, but she still gets along well with a couple of close friends.  (Tr. 51).  In the past, when she was working, she sometimes got along with co-workers and sometimes did not, but most of the time she got along with her supervisors.  (Tr. 52).

Morgan testified that she first treated with Dr. Fishrae at The Guidance Center, but subsequently requested another doctor because she did not "feel comfortable" with Dr. Fishrae.  (Tr. 44).  She then saw Dr. Ballard for "a couple of months."  (*Id.*).  Morgan admitted that she missed "a lot" of appointments.  (Tr. 45).  She also acknowledged that although her therapists recommended that she attend group therapy sessions, she did not do so because she felt more comfortable in a one-on-one setting.  (Tr. 47).  She testified that she was taking Lexapro and Buspar, but she did not know whether they were helping, and they produced side effects (such as digestive issues and blurry vision).  (Tr. 46-47).  She did acknowledge, however, that her doctors have changed her medications, and the side effects of her current medications are not as bad as

---

[5] Morgan also testified that sometimes she does not know the date.  For example, she said that she arrived at the hearing location the day before the hearing was scheduled.  (Tr. 52).

they were in the past.  (Tr. 50).  Since her alleged onset date, Morgan has not been hospitalized for her mental condition, and she has had no emergency room visits.  (Tr. 48-49).

### 3.   *Medical Evidence*

#### (a)   *The Guidance Center*

On April 21, 2008, Morgan was first seen at The Guidance Center, where she sought help because she was having chest pains that she believed were caused by anxiety.[6]  (Tr. 236).  She initially presented as happy, cooperative, and alert.  (Tr. 311).  Morgan was fully oriented and her memory and judgment were intact, but her insight was impaired/minimal.  (Tr. 238).  Her affect was appropriate, but she was described as "mildly anxious."  (Tr. 238-39).  She was diagnosed with major depressive disorder and panic disorder without agoraphobia and assigned a Global Assessment of Functioning ("GAF") score of 49.[7]  (Tr. 240).

During her May 7, 2008 initial psychiatric evaluation, Morgan was "cooperative yet resistant and not forthcoming with information."  (Tr. 251).  It was noted that some of the information she provided contradicted information she had given at intake.  (*Id.*).  She was alert and oriented to person, place, and time, and her memory was intact.  (*Id.*).  She could recall three objects after five and ten minutes, and both her judgment and insight were adequate.  (*Id.*).  She was diagnosed with dysthymic disorder and assigned a GAF score of 45-50.  (Tr. 252).  Records indicate that Morgan treated at The Guidance Center from May of 2008 through July of 2010; however, the evidence also shows that, during that period of time, she cancelled several therapy sessions for reasons such as lack of transportation, not having money for gasoline, and schedule

---

[6] Morgan indicated that she had been treated for depression and anxiety in the past but reported a history of "not following through as well as taking herself off her medication."  (Tr. 242).

[7] GAF examinations measure psychological, social, and occupational functioning on a continuum of mental-health status from 0 to 100, with lower scores indicating more severe mental limitations.  *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 276 (6th Cir. 2009).

7

conflicts.  (Tr. 246, 268, 269, 275, 277, 282, 296, 302, 303, 362, 368, 377, 380, 393).

In June of 2008, Morgan had a vocational assessment because she wanted "to look for employment outside of her current job – doing housekeeping."  (Tr. 294).  Indeed, in prior therapy appointments, she had discussed her need "to find a higher paying job" and the fact that she hated her job because her boss was "mean" and she wasn't making enough money.  (Tr. 306, 309).  Morgan indicated to her vocational counselor that she was interested in working with troubled youths and was willing to travel within reasonable distances to get to work.  (Tr. 287, 290).  On July 25, 2008, she reported that she had been offered a full-time job as an office assistant with The Guidance Center, and she was very happy to begin this job.  (Tr. 279, 281).  In September of 2008, Morgan apparently took a leave of absence from The Guidance Center to deal with housing issues; she indicated, however, that she would return to work once she secured adequate housing for herself and her daughter.  (Tr. 416).  In November of 2008, Morgan interviewed for a position with a telemarketing and fundraising company, indicating that both her telephone and in-person interviews went well.  (Tr. 265).  However, she apparently only worked in this job for one day.  (Tr. 136, 163).

By March of 2009, Morgan was talking about seeking higher education, and she began to investigate the No Worker Left Behind program, a Michigan state government program that assists unemployed people with obtaining post-secondary education and developing job skills. (Tr. 261).  When asked by her vocational caseworker whether she could complete the program in light of her symptoms, she responded by saying that she was "coping with stress well," and she believed that securing a career would help her out of her financial troubles.  (Tr. 260).  Despite expressing interest in this program, however, Morgan missed the orientation.  (Tr. 253).  She had subsequent income-seeking ventures, including an interview in May of 2009 for an insurance

sales position, as well as plans to go into business with a friend.  (Tr. 253, 258).

During her second psychiatric evaluation, on May 13, 2009, Morgan was alert, cooperative, and oriented to person, place, and time, and her speech was coherent and not pressured.  (Tr. 248).  Her memory was grossly intact, her attention and concentration were appropriate, and her judgment and insight were adequate.  (*Id.*).  Morgan indicated that because she was no longer undergoing individual therapy, medications were probably warranted, and she was prescribed Buspar and Lexapro.  (Tr. 249).  Her diagnosis remained dysthymic disorder, her GAF score was 40-45, and her prognosis was fair.  (*Id.*).

At a medication review in July of 2009, Morgan indicated that her medications were not causing any side effects.  (Tr. 244).  She also indicated that she was not sure that the medications were working, because she still felt depressed, and her Lexapro dosage was increased.  (Tr. 244-45).  In September of 2009, Morgan continued to report that she was not experiencing any side effects as a result of the medication, but she was dealing with "stagnant" issues, including problems with her daughter and her finances.  (Tr. 389).  Her Buspar was increased from twice daily to three times per day.  (Tr. 390).  And, because Morgan was reluctant to attend group therapy, her psychiatrist recommended individual therapy.[8]  (Tr. 389).  By December of 2009, Morgan's mood was stable, and she reported that she was "doing OK" and suffering no side effects from her medication.  (Tr. 387).

In May of 2010, Morgan reported that she was depressed, with a varying mood, and her Buspar dosage was increased.  (Tr. 385-86).  Her treating psychiatrist, Dr. Spencer Ballard noted, however, that her home and work functioning were "OK."  (Tr. 385).  Later that same month, Morgan indicated that she was "uncomfortable" with Dr. Ballard and asked to switch

---

[8] In June of 2010, however, group therapy was again suggested because it was felt that Morgan was a better fit for this treatment modality.  (Tr. 366-67).

psychiatrists. (Tr. 372). The next month, Morgan reported that, despite the increase in Buspar, she was still depressed. (Tr. 383). As a result, Abilify was added, and Morgan was advised to continue her other medications as well. (Tr. 384). In July of 2010, Morgan reported hearing the voice of God and having panic attacks in the park. (Tr. 381). Her mood was euthymic, and her sleep and appetite were good. (*Id.*). The Abilify was discontinued, and she was prescribed Lexapro, Buspar, and another medication (which is illegible) by Dr. Koneru (who apparently replaced Dr. Ballard as Morgan's psychiatrist). (Tr. 382). On July 26, 2010, however, Morgan complained about Dr. Koneru, saying that he too made her "uncomfortable." (Tr. 361). At that same time, Morgan reported that she was not "ready to work," and that she wanted to "work on herself" before she returned to the workforce. (*Id.*).

On June 11, 2010, Dr. Ballard completed a Medical Source Statement. (Tr. 358-59). The form instructed Dr. Ballard to rate Morgan's capabilities to perform various work-related mental functions. (Tr. 358). The form specifically instructed: "**IT IS VERY IMPORTANT TO DESCRIBE THE FACTORS THAT SUPPORT YOUR ASSESSMENT. WE ARE REQUIRED TO CONSIDER THE EXTENT TO WHICH YOUR ASSESSMENT IS SUPPORTED.**" (*Id.*) (emphasis in original). In that document, Dr. Ballard checked boxes indicating that Morgan's ability to understand, remember, and carry out instructions was affected by her mental impairment(s), and that she had only a "fair" ability to perform all of the listed work-related activities. (*Id.*). However, despite the form's clear instruction to provide support for his findings, Dr. Ballard left blank the portion of the form where he was asked to specify "What medical/clinical finding(s) support this assessment?" (*Id.*).

Dr. Ballard also indicated that Morgan's ability to respond to supervision, co-workers, and work pressures in a work setting was affected by her impairments, and he rated her abilities

10

in these areas as either "fair" or "poor." (Tr. 358-59). When asked what supported that assessment, Dr. Ballard wrote only: "Client's migraines she states causes a lot of these difficulties."[9] (Tr. 359).

*(b)    Consultative and Non-Examining Sources*

*(1)    Dr. Basivi Baddigam*

On September 14, 2009, Morgan underwent a consultative psychological examination with Dr. Basivi Baddigam, a psychiatrist. (Tr. 335-37). In his report, Dr. Baddigam noted that Morgan was in touch with reality but had low self-esteem. (Tr. 336). Morgan reported no suicidal or homicidal ideations. (*Id.*). Dr. Baddigam found that Morgan had limited insight, but then stated, "It appears that [Morgan] may be exaggerating her symptoms." (*Id.*). Dr. Baddigam characterized Morgan as cooperative during the evaluation, with appropriate affect and a calm mood. (*Id.*). She could recall four of four digits forward and backward, and after five minutes, she could recall two of three objects. (*Id.*). However, she completed simple verbal mathematical equations and serial sevens with some errors. (*Id.*). Dr. Baddigam concluded that Morgan suffered from panic disorder with agoraphobia, dysthymic disorder (in partial remission), and intermittent explosive disorder and evaluated her GAF at 60. (Tr. 337). His prognosis was guarded. (*Id.*).

*(2)    Residual Functional Capacity Assessment*

On September 24, 2009, Zahra Khademian, M.D., reviewed Morgan's records and completed a Psychiatric Review Technique and Mental Residual Functional Capacity ("RFC") Assessment. (Tr. 338-55). Dr. Khademian noted that Morgan suffers from dysthymia in partial remission, panic disorder, and intermittent explosive disorder. (Tr. 345, 347, 349). She opined

---

[9] Morgan is not alleging that she is disabled as a result of any physical impairment. (Tr. 48).

11

that Morgan is moderately limited in her activities of daily living and social functioning, and mildly limited in maintaining concentration, persistence, and pace, with no episodes of decompensation.[10]   (Tr. 352).   She noted Morgan's history of anxiety and depression, the fact that she had received outpatient treatment "on and off" for approximately two years, and her "otherwise fairly unremarkable mental status exam" with Dr. Baddigam.   (Tr. 340).   Dr. Khademian concluded that Morgan could perform simple work activities.   (*Id.*).

### 4. Vocational Expert's Testimony

Frank Mendrick testified as an independent vocational expert ("VE") at the hearing before the ALJ.   (Tr. 58-64).   The VE characterized Morgan's past relevant work as a pharmacy technician as semi-skilled in nature, and light exertion.   (Tr. 60).   The ALJ asked the VE to imagine a claimant of Morgan's age, education, and work experience, who was able to perform a full range of unskilled work at all exertional levels, with the following nonexertional limitations: low stress work environment (which the ALJ defined as one "requiring only minimal changes in work tasks"); simple, routine, repetitive work tasks; work near or around others but not as part of a collaborative team; no contact with the public; and only occasional interaction with supervisors or co-workers.   (Tr. 61-62).   The VE testified that the hypothetical individual would not be capable of performing Morgan's past relevant work.   (Tr. 62).   However, the VE testified that the

---

[10] Specifically, in her RFC Assessment, Dr. Khademian opined that Morgan is not significantly limited in her ability to remember locations and work-like procedures; understand, remember, and carry out very short and simple or detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; interact appropriately with the general public; ask simple questions or request assistance; get along with co-workers without distracting them; maintain socially appropriate behavior; and respond appropriately to changes in the work setting.   (Tr. 338-39).   Dr. Khademian further opined that Morgan is moderately limited in the ability to perform activities within a schedule and maintain regular attendance; complete a normal workday and workweek without interruptions from psychological symptoms; and accept instructions and respond appropriately to criticism from supervisors.   (*Id.*).

hypothetical individual would be capable of working in the positions of cleaner (2,000 medium level jobs in Michigan), hand packer (10,000 medium level jobs in Michigan), small products assembler (4,000 light level jobs in Michigan), inspector (2,000 light level jobs in Michigan), final assembler (1,800 sedentary level jobs in Michigan), and hand inspector (1,000 sedentary level jobs in Michigan). (Tr. 63). Upon further questioning by the ALJ, the VE testified that if the hypothetical individual had to miss work two or more days per month, or was off task more than 15% of the day because of difficulties in concentration, such limitations would preclude employment altogether. (Tr. 63-64).

### C.      Framework for Disability Determinations

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" in relevant part as the:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §1382c(a)(3)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Scheuneman v. Comm'r of Soc. Sec.*, 2011 WL 6937331, at *7 (E.D. Mich. Dec. 6, 2011) (citing 20 C.F.R. §§404.1520, 416.920); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps . . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [defendant]."  *Preslar v. Sec'y of Health & Human Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### D.     The ALJ's Findings

Following the five-step sequential analysis, the ALJ found that Morgan is not disabled under the Act.  At Step One, the ALJ found that Morgan has not engaged in substantial gainful activity since January 1, 2008, her alleged onset date.  (Tr. 21).  At Step Two, the ALJ found that Morgan has the severe impairments of panic disorder without agoraphobia and depressive/dysthymic disorder.  (*Id.*).  At Step Three, the ALJ found that Morgan's mental impairments, whether considered alone or in combination, do not meet or medically equal Listing 12.04 (for affective disorders) or Listing 12.06 (for anxiety-related disorders).  (Tr. 21-23).

The ALJ then assessed Morgan's residual functional capacity ("RFC"), concluding that she is capable of performing the full range of unskilled work at all exertional levels, but with the following nonexertional limitations:  low stress environment (which was defined as requiring only minimal changes in work tasks or work environment); simple, routine, repetitive work tasks; work near or around others but not as part of a collaborative team; no contact with the public; and only occasional interaction with supervisors or co-workers.  (Tr. 23-29).

At Step Four, the ALJ determined that Morgan is unable to perform her past relevant

work as a pharmacy technician, which was semi-skilled in nature and light exertion.  (Tr. 29).  At Step Five, the ALJ concluded, based in part on the VE's testimony, that Morgan is capable of performing a significant number of jobs that exist in the national economy.  (Tr. 29-30).  As a result, the ALJ concluded that Morgan is not disabled under the Act.  (Tr. 30).

### E.      Standard of Review

The District Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. §405(g).  Judicial review under this statute is limited in that the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal citations omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses.") (internal quotations omitted).  Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotations omitted).  In deciding whether substantial evidence supports the ALJ's decision, the court does "not try the case *de novo*, resolve conflicts in evidence or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007); *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant.").

When reviewing the Commissioner's factual findings, the court is limited to an

examination of the record and must consider the record as a whole.  *Bass*, 499 F.3d at 512-13;

*Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992).  The court "may

look to any evidence in the record, regardless of whether it has been cited by the Appeals

Council," or in this case, the ALJ.  *Heston*, 245 F.3d at 535; *Walker v. Sec'y of Health & Human

Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).  There is no requirement, however, that either the ALJ

or this court discuss every piece of evidence in the administrative record.  *See Kornecky v.

Comm'r of Soc. Sec.*, 167 Fed. Appx. 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all

evidence without directly addressing in his written decision every piece of evidence submitted by

a party.") (internal quotations omitted).  If the Commissioner's decision is supported by

substantial evidence, "it must be affirmed even if the reviewing court would decide the matter

differently and even if substantial evidence also supports the opposite conclusion."  *Cutlip v.

Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted).

F.      **Analysis**

In her opinion, the ALJ found that Morgan has the severe impairments of panic disorder

without agoraphobia and depressive/dysthymic disorder.  (Tr. 21).  The ALJ further found that

these impairments impose limitations on Morgan's ability to work.  As a result, she concluded

that Morgan has the RFC to perform the full range of unskilled work at all exertional levels, but

with the following nonexertional limitations:  low stress environment (which was defined as

requiring only minimal changes in work tasks or work environment); simple, routine, repetitive

work tasks; work near or around others but not as part of a collaborative team; no contact with

the public; and only occasional interaction with supervisors or co-workers.  (Tr. 23-29).

Morgan argues that the ALJ's RFC finding, and the hypothetical question subsequently

posed to the VE, failed to accurately portray her credible mental limitations.  Specifically,

Morgan argues that the ALJ improperly discounted the opinions of three medical providers, and

16

that the ALJ's RFC finding failed to take into account her moderate limitations with respect to concentration, persistence, and pace.  Each of these arguments will be addressed in turn.

### 1. The ALJ's RFC Finding is Supported by Substantial Evidence

#### (a) The ALJ Properly Evaluated the Medical Opinions

Morgan asserts that the record contains three psychological evaluations, completed between August of 2008 and June of 2010, all of which "point to her being unable to sustain even unskilled occupations on a regular and sustained basis."  (Doc. #8 at 12).

##### (i) Low GAF Scores

Morgan first takes issue with the ALJ's consideration of two reports[11] which assigned her a GAF score below 50.  (Doc. #8 at 12).  Specifically, Morgan relies on the April 2008[12] assessment, which includes a diagnosis of major depressive disorder and panic without agoraphobia, and assigns her a GAF score of 49 (Tr. 240), and the May 13, 2009 psychiatric evaluation, *supra*, p. 9, which contains a diagnosis of dysthymic disorder and a GAF score of 40-45.  (Tr. 249).  Apparently, Morgan believes that these diagnoses and GAF scores compel a conclusion that she is disabled.  There is no merit to this argument.

As an initial matter, as the Commissioner correctly points out, the Sixth Circuit has held that GAF scores are not critical to a determination of an individual's RFC.  *See Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy.

---

[11] As noted above, Morgan also was assigned a GAF score of 45-50 at her May 7, 2008 initial psychiatric evaluation at The Guidance Center.  (Tr. 252).  Although Morgan does not mention this GAF score in her motion, the court has considered it as well in assessing the merits of her argument.

[12] Although Morgan refers to an "August 6, 2008" report in her motion, it appears that she is relying on the April 2008 intake assessment, which was later signed by a psychiatrist on August 6, 2008 (Tr. 236-43), as she cites to "Tr. 240" in her motion.  (Doc. #8 at 12).

Thus, the ALJ's failure to reference the GAF score in the RFC, standing alone, does not make the RFC inaccurate."); *see also White v. Comm'r of Soc. Sec.*, 2011 WL 5104622, at *3 (E.D. Mich. Oct. 27, 2011) (there is no statutory, regulatory, or other authority requiring the ALJ to "put stock" in a GAF score). Moreover, the ALJ did not overlook Morgan's GAF scores. Indeed, she specifically referenced Morgan's GAF scores of between 45-50, explaining that they suggested "moderate symptoms." (Tr. 25). In determining Morgan's RFC, however, the ALJ did not rely on Morgan's GAF scores alone. Rather, she also considered evidence that Morgan presented for her initial intake at The Guidance Center as happy, cooperative, and alert. (Tr. 25). The ALJ also considered that at her May 2009 psychological evaluation, Morgan was alert and oriented to person, place and time; her speech was coherent and not pressured; her memory was grossly intact; and her concentration and attention were appropriate. (Tr. 25-26). The ALJ noted that, by December of 2009, Morgan's mood had stabilized, and she reported that she was doing "okay." (Tr. 26). In addition, the ALJ appropriately considered Morgan's pattern of missed appointments for various reasons, her unwillingness to participate in group therapy, and her repeated requests to change psychiatrists, as well as her activities of daily living, in assessing the seriousness of her alleged symptoms. (Tr. 27). In sum, given all of the evidence presented, the ALJ's decision to decline to rely exclusively on Morgan's GAF scores in determining her RFC was reasonable. *See DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006) ("Accordingly, we have affirmed denials of disability benefits where applicants had Global Assessment Functioning scores of 50 or lower.")

### (ii)    Dr. Ballard's Medical Source Statement

Morgan also argues that the ALJ should have given more weight to Dr. Ballard's June 2010 Medical Source Statement, which, she claims, supported greater limitations than those

eventually included in the RFC finding.  (Doc. #8 at 12).  Specifically, Morgan argues that the

ALJ erred in disregarding Dr. Ballard's opinion that she "had numerous work preclusive

limitations in the areas of concentration, persistence, pace, adaptive functioning and social

functioning."  (Doc. #8 at 12).  It is clear from a review of the ALJ's decision, however, that she

considered Dr. Ballard's opinion, as she explicitly stated, "Most of the limitations Dr. Ballard

checked are consistent with the residual functional capacity I assessed."  (Tr. 28).  And, although

the ALJ gave "little weight" to Dr. Ballard's opinion that Morgan had poor abilities to accept

instruction and respond to criticism, get along with others, and respond to work-setting changes,

her determination in this regard is supported by substantial evidence.  (*Id.*).

The applicable regulations provide that:

> Generally, we give more weight to opinions from your treating
> sources, since these sources are likely to be the medical
> professionals most able to provide a detailed, longitudinal picture
> of your medical impairment(s) and may bring a unique perspective
> to the medical evidence that cannot be obtained from the objective
> medical findings alone or from reports of individual examinations,
> such as consultative examinations or brief hospitalizations.

20 C.F.R. §404.1527(c)(2).  If the opinion of a treating source is not accorded controlling weight,

an ALJ must apply certain factors – namely, the length of the treatment relationship and the

frequency of examination, the nature and extent of the treatment relationship, the supportability

of the opinion, the consistency of the opinion with the record as a whole, and the specialization

of the treating source – in determining what weight to give the opinion.  *See Wilson v. Comm'r of

Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Here, the ALJ explicitly considered the factors set forth above in concluding that Dr.

Ballard's opinion imposing work-preclusive limitations should be given little weight.  The ALJ

noted that Dr. Ballard only treated Morgan for a few months.  (Tr. 28, 44).  This is an appropriate

factor to consider.  *See* 20 C.F.R. §404.1527(c)(2)(i) (more weight given to opinion from treating

19

source with longer treatment relationship and greater frequency of examination).  The ALJ also explained that Dr. Ballard's conclusions were not supported by his own treatment notes, by treatment notes of other mental health providers, or by Morgan's own hearing testimony.  (Tr. 28).  For example, Morgan testified that she got along with her prior supervisors most of the time and only had problems with co-workers if disagreements arose.  (Tr. 28, 52).  She also indicated in a function report that she got along well with authority figures, did not have trouble getting along with others, and had never been fired from a job because of problems getting along with others.  (Tr. 179-80).  In various treatment notes, Morgan was cooperative, alert, and oriented, with appropriate concentration and attention.  (Tr. 248).  She expressed no homicidal or suicidal tendencies, and her home and work functioning was described as "ok."  (Tr. 385).  Moreover, when asked what supported his assessment that Morgan's mental impairments limit her ability to get along with supervisors and co-workers, Dr. Ballard said only, "Client's migraines she states causes a lot of these difficulties."  (Tr. 359).  Thus, the ALJ's impression that Dr. Ballard "may have based his opinion on [Morgan's] own subjective descriptions of her limitations not on his clinical findings" (Tr. 28) is borne out by the record evidence.  *See, e.g., Williams v. Astrue*, 2010 WL 503140, at *9 (E.D. Tenn. Feb. 8, 2010) (where treating physician's opinion is "largely based on plaintiff's self-reporting," it is not error for the ALJ to give that opinion "minimal weight").

For all of these reasons, the ALJ did not err in her consideration of these three medical opinions, and her RFC finding is supported by substantial evidence.

> (b)     *The ALJ's RFC Finding Adequately Accommodated Morgan's Moderate Limitations in Concentration, Persistence, and Pace*

Morgan also appears to argue that the ALJ's RFC finding – which limited her to simple, repetitive, and routine work in a low stress environment – did not adequately address her

moderate limitation with respect to concentration, persistence, and pace.[13]  (Doc. #8 at 12).

As an initial matter, the ALJ's conclusion that Morgan is moderately limited in this area was generous.  In her RFC Assessment, Dr. Khademian opined that Morgan was only *mildly* limited in concentration, persistence, and pace.  (Tr. 352; *see also* fn. 10, *supra*).  At a mental status examination with Dr. Baddigam, Morgan could recall four of four digits backward and forward and, after five minutes, could recall two of three objects.  (Tr. 336).  Her treating psychiatrist described her attention and concentration as appropriate and found her recent, remote, and immediate memory levels to be intact.  (Tr. 248).  Thus, the ALJ appears to have given Morgan the benefit of the doubt in concluding that she is moderately limited in maintaining concentration, persistence, and pace.

Even assuming that Morgan is moderately limited in these areas, the ALJ appropriately accounted for these deficiencies in her RFC finding by limiting Morgan to work in a "low stress environment" (defined as "only minimal changes in work tasks or work environment") and "simple, routine, repetitive work tasks."  (Tr. 23).  Courts have held that similar limitations are adequate to account for moderate deficiencies in concentration, persistence, and pace.  *See, e.g., Layne v. Commissioner of Soc. Sec.*, 2009 WL 2496474, at *3 (E.D. Mich. Aug. 17, 2009) (substantial evidence supported ALJ's finding that claimant with moderate deficiencies in concentration, persistence, and pace could perform simple, unskilled work of "1-2-3- step operations"); *Berkowski v. Commissioner of Soc. Sec.*, 652 F. Supp. 2d 846, 860 (E.D. Mich. 2009) (ALJ's limitation of claimant, who had moderate deficiencies in concentration, persistence, and pace, to "simple, unskilled work with one, two or three step instructions" was

---

[13] To the extent that Morgan advances this argument, she does so only in the most conclusory manner.  Because the Commissioner briefed this issue in his motion, however, and in the interest of thoroughness, the court will consider the merits of this argument in ruling on the pending motions.

sufficient).

There certainly are situations in which the limitations imposed by the ALJ might be insufficient to address deficiencies in concentration persistence and pace.[14]   In this case, however, Morgan has not explained why more detailed or more specific nonexertional limitations are required in order to adequately account for her deficiencies in these areas.  Nor has she offered any suggestion as to what those additional limitations should be.  Under the facts of this case, by expressly limiting Morgan to work in a "low stress environment" (defined as "only minimal changes in work tasks or work environment") and "simple, routine, repetitive work tasks," the ALJ adequately accounted for Morgan's limitations in concentration, persistence, and pace.  (Tr. 14, 67).

### 2.    *The ALJ's Hypothetical Questions Were Appropriate*

Finally, Morgan appears to argue that the ALJ's hypothetical questions to the VE were insufficient because they did not account for all of her limitations, specifically her moderate limitations with respect to concentration, persistence, and pace.  (Doc. #8 at 12).

An ALJ may rely on the testimony of a vocational expert to determine whether jobs would be available for an individual who has workplace restrictions.  *See Wilson*, 378 F.3d at 548.   However, in order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of a conclusion that the claimant can perform other work, the question must accurately portray the claimant's physical and mental impairments.  *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010).  Where the hypothetical question fails to reflect each of the claimant's limitations that are supported by substantial evidence, the vocational expert's answer has no evidentiary value.  *See Paden v.*

---

[14] *See, e.g., Benton v. Commissioner of Soc. Sec.*, 511 F. Supp. 2d 842, 849 (E.D. Mich. 2007); *Green v. Commissioner of Soc. Sec.*, 2009 WL 2365557, at *10 (E.D. Mich. July 28, 2009).

*Barnhart*, 92 F. App'x 465, 468 (9th Cir. 2004).

To the extent that Morgan argues that the nonexertional limitations imposed by the ALJ (namely, limiting her to a low stress environment and simple, routine, and repetitive work tasks) do not adequately address her moderate limitation with respect to concentration, persistence, and pace, the court has already addressed that claim above, finding that the limitations imposed by the ALJ in this respect were appropriate and supported by substantial evidence.  The ALJ posed a complete hypothetical question to the VE and reasonably accepted the VE's testimony that the hypothetical individual described could perform work which exists in significant numbers in the state of Michigan.  This testimony provides substantial evidence to support the ALJ's finding that Morgan was not disabled.  *See Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994) (where hypothetical accurately described the plaintiff in all relevant respects, the VE's response to the hypothetical question constitutes substantial evidence).

Because the hypothetical questions the ALJ posed to the VE included all of Morgan's credible limitations, the VE's testimony was sufficient and the ALJ was entitled to rely upon it.  Therefore, substantial evidence supports the ALJ's determination that Morgan was not disabled.

## III.    CONCLUSION

For the foregoing reasons, the court RECOMMENDS that the Commissioner's Motion for Summary Judgment [9] be GRANTED, Morgan's Motion for Summary Judgment [8] be DENIED, and the ALJ's decision be AFFIRMED.

Dated: November 28, 2012                          s/David R. Grand
Ann Arbor, Michigan                               DAVID R. GRAND
                                                  United States Magistrate Judge

**NOTICE**

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and Fed. R. Civ. P. 72(b)(2).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of HHS*, 932 F.2d 505, 508 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947, 949–50 (6th Cir. 1981).  The filing of objections which raise some issues, but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation.  *See Willis v. Secretary of HHS*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987).  Pursuant to E.D. Mich. L.R. 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.


**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on November 28, 2012.

s/Felicia M. Moses
FELICIA M. MOSES
Case Manager

24